**TOLBOE CONSTRUCTION COMPANY,**
a Utah Corporation, Plaintiff
and Appellant,

v.

**STAKER PAVING & CONSTRUCTION COMPANY, a Utah corporation,**
Defendant and Respondent.

No. 18691.

Supreme Court of Utah.

April 30, 1984.

F. Robert Bayle, Bayle, Hanson, Nelson & Christensen, Paul R. Howell, Salt Lake City, for plaintiff and appellant.

Charles W. Hanna, Joseph C. Rust, Kesler & Rust, Salt Lake City, for defendant and respondent.

SAM, District Judge:

Plaintiff appeals from a judgment for defendant in an action to recover damages resulting from defendant's refusal to perform certain paving work according to a bid it submitted to plaintiff.

On September 7, 1979, Plaintiff Tolboe Construction Company, a licensed general contractor, submitted a bid to the Veteran's Administration for the construction of a "Clinical and Ambulatory Care" addition to the Veteran's Administration Hospital in Salt Lake City.

On the same day and just prior to the submission of its bid, plaintiff received bids from three subcontractors for the asphalt paving section of the project. The bids for that particular section consisted of a base bid and an alternate bid, delineated as alternate No. 4. The following are the bids submitted by the subcontractors:

| Company | Base Bid | Alternate No. 4 |
| --- | --- | --- |
| Staker Paving & Construction | $ 29,081 | $110,547 |
| Geneva Rock Products | 84,360 | 58,596 |
| Gibbons & Reed | 102,188 | 57,607 |

Upon receiving these bids and recognizing the large disparity between defendant Staker's base bid and that of the other subcontractors, Michael Tolboe, acting on behalf of the plaintiff company and pursuant to its policy to verify a bid which is 10 to 15 percent below other bids, telephoned defendant and informed William Morris, defendant's estimator, that the bid was low and should be reviewed. Following that conversation, Mr. Morris reexamined his calculations and determined once again that they were accurate; whereupon, he telephoned Mr. Tolboe and reconfirmed the bid. On the basis of that confirmation, plaintiff incorporated defendant's bid into the general bid on the In addition to submitting a bid to plaintiff, defendant also submitted one on the same day to another general contractor bidding on the hospital project, namely, the Oakland Construction Company (hereinafter "Oakland"). Oakland also noted a substantial disparity between defendant's bid and others it had received, and like plaintiff, called Staker to verify the low bid. In that telephone conversation, Ken Hutchins, Oakland's representative, reviewed with Mr. Morris (defendant's estimator) the items included in the bid to determine why it was so low. As a result of that conversation, Oakland determined that the Staker bid was incomplete and rejected it.

On or about November 1, 1979, a meeting was held between Mr. Tolboe and Mr. Morris, at the request of Mr. Tolboe, to

discuss details of the project. During that meeting Mr. Tolboe mentioned the paving of a certain parking lot (parking lot No. 1), and was immediately informed by Mr. Morris that defendant's bid did not include the paving of that particular lot because it had not been specified in the plans. A meeting was then arranged and held later that same day with Gordon Staker to discuss the problem further. Mr. Staker advised Mr. Tolboe at that time that defendant would not perform the paving work for the amount of its bid if the subcontract required paving parking lot No. 1.

On November 5, 1979, plaintiff received the contract for the Veteran's Administration Hospital project (the base bid only). Upon receiving said contract, plaintiff immediately contacted defendant to discuss the first phase of the work required under the contract. Again, Mr. Tolboe was informed that defendant would not perform until the problem regarding parking lot No. 1 was resolved and the scope of work clarified.

At a meeting held in late November, 1979, with all parties present, it was determined, by reviewing the plans and specifications available to defendant at the time the subcontract bid was prepared, that Mr. Morris had overlooked certain specifications when preparing defendant's bid and thus had made an error in calculating. Defendant acknowledged the mistake but refused to perform the substantially greater quantity of work on the basis of the erroneous bid.

As a consequence, plaintiff had to perform some of the initial work which was to be included in the paving subcontract, and thereafter, to subcontract the balance of the work to Geneva Rock Products. According to plaintiff's evidence, the amount ultimately expended for the asphalt paving work was $101,744, which included costs for the work done by plaintiff of $15,494 and costs for the subcontractor's performance of $83,360. Plaintiff therefore alleges that its reliance upon defendant's bid resulted in damages of $72,663, that being

the amount the actual costs for the paving work exceeded defendant's bid of $29,081.

Plaintiff prosecuted this action at trial on the theory of promissory estoppel, which has been defined in the *Restatement (Second) of Contracts* § 90 as follows:

A promise which the promisor should reasonably expect to induce action or forebearance on the part of the promisee or a third person and which does induce such action or forebearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.

Staker's defense against the aforesaid theory was that plaintiff could not produce the necessary evidence to establish an essential element of the doctrine of promissory estoppel, namely, that the promisee's reliance was reasonable or justifiable under the circumstances. At the conclusion of the presentation of evidence, the question of the reasonableness of plaintiff's reliance was submitted to an advisory jury, which returned a verdict as follows: "We, the jurors, impaneled in the above case, find that the plaintiff Tolboe Construction Company did not reasonably rely on the bid given to them by Staker Paving & Construction Company." This verdict was adopted by the trial court and judgment was entered accordingly, in defendant's favor. Plaintiff appealed.

The principal contention raised by plaintiff on appeal is that the undisputed facts of this case warrant the application of the doctrine of promissory estoppel and that the trial court's ruling to the contrary was therefore erroneous.

The doctrine of promissory estoppel and the prerequisites for an action based thereupon have been described by this Court as follows:

[Promissory estoppel] is a doctrine of equity which the plaintiff could claim the benefit of only by showing the facts required to justify its application. These would include that the defendants were aware of all the material facts; that in such awareness they made the promise

when they knew that the plaintiff was acting in reliance on it; *that the latter, observing reasonable care and prudence, acted in reliance on the promise* and got into a position where it suffered a loss. Under such circumstances, equity recognizes the unfairness of permitting withdrawal of the promise and will enforce it.[1] [Emphasis added.]

The focus of this appeal is limited to the underscored prerequisite regarding the reasonableness of the plaintiff's reliance.

Plaintiff asserts that it took every reasonable precaution to ensure the accuracy and validity of defendant's bid before relying upon it. Specifically, plaintiff refers to its telephone call to defendant's estimator after discovering the disparity between defendant's bid and the others, wherein plaintiff informed the estimator that his bid was substantially low and suggested that he review it. Furthermore, plaintiff points to the fact that it waited until the bid had been reconfirmed by defendant before incorporating it into the general bid on the project. Plaintiff submits that such precautionary measures render its reliance justifiable.

Defendant claims that plaintiff knew or at least should have known that defendant had made an error in its bid, and therefore was not justified in relying upon the bid. This claim arises from the fact that plaintiff, after receiving the bids on the paving subcontract, was aware that defendant's bid was 290 percent below that of Geneva Rock Products, which was the next lowest bid submitted, and was 350 percent below the remaining bid, which had been submitted by Gibbons & Reed. Defendant maintains that this gross disparity should have afforded ample notice to plaintiff that defendant's bid was in error.

In an effort to prove that a large discrepancy between subcontract bids, such as that existing here, is highly unusual and is, moreover, indicative of error, defendant elicited testimony from eight individuals, all of whom had extensive experience in the asphalt paving and general construction industries, in respect to whether they had ever seen a discrepancy in subcontract bids as large as that shown here. All eight witnesses, including Kent Tolboe, president of plaintiff Tolboe Construction Company, and Joe Hansen, plaintiff's estimator, testified that they had never seen a disparity in bids for asphalt paving as large as the one existing in this dispute. Defendant further notes that the largest discrepancy seen by any of those witnesses was 100 percent, and the low bid in that particular instance was rejected.

As additional support for its position, defendant points out that Oakland Construction received the same erroneous bid from defendant and rejected it on the basis of the large disparity factor.

The legal bases for the position urged by defendant are the related doctrines of "mutual" and "palpable" mistake. The former doctrine, as applied in the present context, provides as follows:

> [K]nowledge by one party that the other is acting under mistake is treated as equivalent to mutual mistake for purposes of rescission. [Citations omitted.] Relief from mistaken bids is consistently allowed *when one party knows or has reason to know of the other's error* and the requirements for rescission are fulfilled.[2] [Emphasis added.]

Likewise, under the latter doctrine (palpable mistake), if the offeree caused, knew of, should have known of or had reason to know of the offeror's mistake, the mistake is "palpable" and as such may be rescinded by the offeror.[3] We hold that these doc-

---

**1.** *Union Tank Car Company v. Wheat Bros.,* 15 Utah 2d 101, 387 P.2d 1000, 1003 (1964). *Accord, Ferrer v. Taft Structurals, Inc.,* 21 Wash. App. 832, 587 P.2d 177 (1978); *James King & Son, Inc. v. DeSantis Construction,* 97 Misc.2d 1063, 413 N.Y.S.2d 78 (1977); *Drennan v. Star Paving Company,* 51 Cal.2d 409, 333 P.2d 757 (1958).

**2.** *M.F. Kemper Const. Co. v. City of Los Angeles,* 37 Cal.2d 696, 235 P.2d 7, 10 (1951).

**3.** Jones, The Law of Mistaken Bids, 48 Cin.L. Rev., 43 (1979).

trines are applicable here and, as shown hereafter, are indeed supportive of defendant's position.

An appropriate test for determining whether an offeree either knew or should have known of a mistake in a bid was established in the case of *Chernick v. United States.*[4] That test was articulated thus:

> The test of what an official in charge of accepting bids "should" have known must be that of reasonableness, i.e., whether under the facts and circumstances of the case there were any factors which reasonably should have raised the presumption of error in the mind of the contracting officer; among such factors are *obvious wide range of bids,* and gross disparity between the price bid and value of the article which was the subject of the bid.[5] [Emphasis added.]

The "reasonableness" standard set forth above was applied more recently by the Oregon State Supreme Court in a case entitled *Gardner v. Meiling.*[6] In that case, the court, after noting that there was not sufficient evidence to support the conclusion that "a reasonable person would have known of the mistake," made the following observation:

> The most typical situation is where an offer is so inconsistent with the true value of the bargain that a reasonable person would know the offeror made a mistake in his evaluation. *For example, a bid on a public contract which is much lower than all other bids received would put the public body on notice that the offeror has made a mistake in calculating the bid.* In such instance, rescission will be allowed if the offeror is not guilty of gross negligence in making the mistake ....[7] [Emphasis added.]

The facts of the instant case, particularly those mentioned above relative to the large disparity in the subcontract bids received by plaintiff, when scrutinized under the "reasonableness" standard, compel the conclusion that plaintiff, at the very least, "had reason to know" that defendant's bid was erroneous, and therefore should not have relied upon it.

The issue presently before us (to wit: the reasonableness of a contractor's reliance upon a subcontractor's erroneous bid) is not one of first impression in this jurisdiction. In *Union Tank Car Co. v. Wheat Brothers,*[8] under factual circumstances very similar to those of the instant case, this Court refused to invoke the doctrine of promissory estoppel to enforce a mistaken subcontractor's bid for the principal reason that "[p]laintiff ... knew that there was a *great disparity (about 35%)* between Wheats' price and the next lowest bid."[9] (Emphasis added.)

As indicated previously herein, the disparity between the bid submitted by defendant and the next lowest bid is in excess of 290 percent, which is significantly larger than the 35 percent which this Court considered a "great disparity" in *Union Tank, supra.*

Also relevant to the present inquiry is the further point made in the *Union Tank* decision that the offeror's verification of a mistaken bid, when prompted by a mere generalized request by the offeree, does not serve to validate the erroneous bid or justify the offeree's reliance thereupon. In that case, the offeree called the subcontractor twice for verification of the bid, but failed on either occasion to specifically discuss or even mention the apparent error in the bid.[10]

This same point was stressed in the case of *United States v. Metro Novelty Manufacturing Co.*[11] There, the court noted

---

4. 372 F.2d 492 (1967).

5. *Id.* at 496.

6. 280 Or. 665, 572 P.2d 1012 (1977).

7. *Id.* at 1017.

8. *Supra* note 1.

9. *Id.* at 1003.

10. *Id.*

11. 125 F.Supp. 713 (S.D.N.Y.1954).

that the error in the subcontractor's bid was so gross that the plaintiff's mere receipt thereof constituted sufficient notice of the error. The court also held that inasmuch as the plaintiff requested verification of the bid without putting the offeror/defendant on notice of the error, verification of the bid by the defendant did not bar rescission. Plaintiff, in that case, had requested in mere general terms that the defendant check his figures.

In the case at bar, although there was some dispute as to the precise language used by plaintiff in its telephone request for verification of the Staker bid, the record clearly discloses that plaintiff's request was made in very general, uninformative terms. According to plaintiff's own version of the request, defendant's estimator was merely informed, as would be any bidder whose bid was 10 to 15 percent below the next lowest bid, that his bid was substantially low, and further was asked to reconfirm it. Nothing was mentioned by plaintiff with respect to the large disparity between defendant's bid and the others, or of any other apparent error. Thus we conclude that plaintiff's request for verification did not validate the erroneous bid nor justify plaintiff's reliance.

In light of our resolution of the foregoing issue, we find it unnecessary to address the remaining related issues raised by plaintiff. There are, however, two procedural issues which merit our attention at this point.

Plaintiff contends that the trial court failed to follow proper procedure in the entry of its findings of fact, conclusions of law and judgment. The purported basis for this contention is Rule 2.9 of the Rules of Practice in the District Courts of the State of Utah, Written Orders, Judgments and Decrees, which provides: "(b) Copies of proposed findings, judgments, and/or orders shall be served on opposing counsel before being presented to the court for signature unless the court otherwise orders. Notice of objections thereto shall be submitted to the court and counsel within five days after service." Plaintiff maintains that this rule of practice was violated in the manner described hereafter.

The proposed findings of fact and conclusions of law as well as the proposed judgment were certified to have been delivered to plaintiff's counsel on April 27, 1982. Said documents were signed by the trial court on the next day, April 28, 1982. Thus, counsel for plaintiff did not have an opportunity to review the content of these documents pursuant to Rule 2.9 above. Furthermore, plaintiff made appropriate objections to the proposed findings of fact and conclusions of law and filed them with the court on April 29, 1982. However, the court had already signed the documents on the previous day without notice to plaintiff's counsel.

Within a few days after the entry of judgment, the trial judge, by whom this matter had been heard, passed away. He had not had an opportunity to consider and rule upon the plaintiff's objections. Thereafter, plaintiff filed a motion to vacate the judgment and a motion for judgment notwithstanding the verdict, or in the alternative, for a new trial. These motions were heard by the presiding district judge who denied the same. Plaintiff alleges that the denial was entered without due consideration.

 We find no merit in the foregoing contention. The facts related above do not show any violation of Rule 2.9, rather they establish full compliance therewith. The rule requires first that a copy of the documents be served upon opposing counsel before the said documents are presented to the court for signature. As plaintiff, itself, points out (above), the documents were not signed by the court (and as the record discloses they were not presented thereto) until April 28, which was the day after they were served upon plaintiff. The rule's only other requirement is that the notice of objection to the said documents be submitted to both the court and counsel within five days after service. The fact that the court signed the documents prior to plaintiff's submission of objections and prior to the expiration of five days from the service of

 

the documents, does not constitute a violation of this latter requirement. The requirement as well as the rule itself are binding only upon counsel, not upon the trial court. The rule does not therefore preclude the court from signing the documents, as it did, within five days of their service upon counsel. Furthermore, we are unable to detect any prejudice to the plaintiff by reason of the court's early signing of the documents, inasmuch as plaintiff's timely filing of objections preserved any claim it had with respect to the documents and plaintiff received a hearing upon those objections just as it would have had the court waited the full five days before signing the documents. For all these reasons we hold that Rule 2.9 was fully satisfied in this case.

■ As to the plaintiff's claim that its motions were not given due consideration after the death of the judge who tried the case, we find the record devoid of any such proof. The evidence reveals that a hearing was held on the motions which was proper and adequate in all respects.

■ Plaintiff's final contention is that the trial court committed prejudicial error by allowing a jury to sit in an equity proceeding. This contention is likewise lacking in merit. The trial court retained the jury in this case merely as an advisory jury to consider the sole question of the reasonableness of plaintiff's reliance on defendant's bid. The practice of empaneling an advisory jury in proceedings, such as this one in equity, that otherwise do not qualify for the right to a jury, is specifically authorized in Rule 39(c) of the Utah Rules of Civil Procedure, which provides: "In all actions, not triable of right by a jury the court upon motion or of its own initiative may try any issue with an advisory jury ...." We therefore affirm the trial court's action in this regard.

Affirmed.

HALL, C.J., and OAKS and DURHAM, JJ., concur.

STEWART, J., does not participate herein; SAM, District Judge, sat.

HOWE, Justice (concurring).

I concur but do so only because of the magnitude of the difference between the bids submitted to Tolboe. Usually advising a bidder that it is "substantially low," as was done here, should be enough to entitle the other party to rely on the bid after it has been checked and confirmed to be accurate. Here, the discrepancy was so great that the trier of the facts could have reasonably concluded that Tolboe's reliance thereon was not reasonable even though Staker persisted in its error.